IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


MILLIE CARLISLE,
     Plaintiff,

v.                                   Case No. 5:05cv188/MCR/EMT

SALLIE MAE, INC.,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

Pending before the court is Defendant's Motion for Summary Judgment and documents in support thereof (Doc. 24). Plaintiff, proceeding pro se, filed a memorandum and evidentiary materials in opposition (Doc. 30). Upon consideration of the materials submitted by the parties and for the reasons stated below, it is the opinion of the undersigned that Defendant's Motion for Summary Judgment should be granted.

I.      BACKGROUND

The following material facts are without substantial controversy.[1]  Plaintiff raises claims of employer discrimination (disparate treatment in hiring and promotion, and hostile work environment) and retaliation based on her race (*see* Doc. 11).  At the time of the events giving rise to this cause of action, Plaintiff was employed with Sallie Mae's Panama City Loan Servicing Center ("Florida Center") as a Loan Origination Representative (Doc. 24, Carlisle Dep. at 17, 42, Ex. 9; *id.*, DOAH Tr. at 98).  Plaintiff first worked at the Florida Center from September 18, 1989 to September 13, 1990, when she quit and moved out of town (*id.*, Carlisle Dep. 17, 23; *id.*, DOAH Tr. at 97).  Plaintiff sought employment with Sallie Mae again in July 2001 (Doc. 11 ¶10).  She was advised that she would need to first pass a skills test, complete a training class, and then work for Kelly Services for ninety days (*id.*).[2]  Plaintiff passed the skills test, participated in the training class from July 30 to August 31, 2001, and began work for Kelly Services.  After ninety days, on November 26, 2001, Sallie Mae rehired Plaintiff (Doc. 24, DOAH Tr. at 98, 195–96).

When it rehired Plaintiff, Sallie Mae provided her with a copy of the Employee Reference Manual and Business Code of Conduct, containing the equal employment opportunity, anti-harassment, and job abandonment ("no call-no show") policies (*id.*, Carlisle Dep. at 85–86, 92–93, Exs. 11–13; *id.*, DOAH Tr. at 15–17, Exs. P1, P3).  The anti-harassment policy provides several methods to report discrimination (*id.*, Carlisle Dep. at 13).

---

[1]The court conveys the following as facts: (1) those factual allegations contained in Plaintiff's verified amended complaint (Doc. 11); (2) Defendant's affidavits and attachments in support of its motion for summary judgment (Doc. 24), which comply with the requirements for affidavits specified in Rule 56(e) or which would be admissible or usable at trial, Fed. R. Civ. P. 56(e); *see, e.g.*, Woods v. Chicago, 234 F.3d 979 (7th Cir. 2000); Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980); Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980); (3) Plaintiff's attachments in support of her response (Doc. 30) to Defendant's motion for summary judgment, which would be admissible or usable at trial; (4) Plaintiff's testimony in her October 6, 2004 deposition taken in the prior administrative proceeding, which involved the same parties and same issues, *see* Fed. R. Civ. P. 56(c), *id.* 32(a)(4); Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001); Beirwenger Enter. Corp. v. Carletta, 46 F. Supp. 2d 1294, 1296 (M.D. Fla. 1999); and (5) testimony by both parties from the December 4, 2004 evidentiary hearing before a DOAH Administrative Law Judge, *see* Kelley v. Price-Macedon, Inc., 992 F.2d 1408, 1415 n. 12 (5th Cir. 1993); Beirwenger, 46 F. Supp. 2d at 1296.  This court will not construe as facts any unsworn allegations contained in Plaintiff's amended response (Doc. 30) to Defendant's motion to dismiss, because the unsworn allegations do not meet the requirements of Federal Rule of Civil Procedure 56.  *See* Fed. R. Civ. P. 56(c), -(e).  Plaintiff was advised of the Rule 56 requirements by order of this court before she filed her amended response (*see* Doc. 29).

[2]Sallie Mae's practice was to hire regular employees only after they worked through Kelly Services for ninety days (Doc. 24, DOAH Tr. at 195–97).

The job abandonment policy provides that "employees who are absent for three consecutive days without notifying their supervisor will be considered to have voluntarily resigned" (*id.*, Carlisle Dep. Ex. 22; *id.*, DOAH Tr. at 210–12, Ex. R22).  This policy is automatically applied upon an absence of three days without proper notification; after an employee is absent for three days without calling, the employee's supervisor requests that termination be processed for that employee (*id.*, Wiley Aff. ¶9; *id.*, Wunstell Aff. ¶6; *id.*, DOAH Tr. at 212, 230).  Sallie Mae contends that it does not generally call employees at home if they fail to appear at work for three consecutive days without notifying their supervisors (*id.*, Wiley Aff. ¶10; *id.*, DOAH Tr. at 230–31).  However, Plaintiff cites one instance in which Sallie Mae allegedly did not follow this policy (Doc. 30, Ex. 2).  Sallie Mae has consistently enforced its job abandonment policy (Doc. 24, Wiley Aff. 12; *id.*, DOAH Tr. at 213–14, 232–33).  During 2002 and the first six months in 2003, the company terminated twenty-eight employees at the Florida Center under the "no call-no show" policy, including Plaintiff (*id.*, Carlisle Dep. at 172; *id.*, Wiley Aff. ¶12; *id.*, DOAH Tr. at 213–14, Ex. R32). Twenty-five of those terminated under the policy were white (*id.*, Wiley Aff. ¶12; *id.*, DOAH Tr. at 213–14).  None of the terminated employees, other than Plaintiff, had participated in an investigation of a discrimination complaint or had filed a discrimination complaint (*id.*, Wiley Aff. ¶12; *id.*, DOAH Tr. at 213–15).  Plaintiff cannot identify any white employee who violated Sallie Mae's "no call-no show" policy and was not terminated (*id.*, Carlisle Dep. at 170–72; *id.*, DOAH Tr. at 142–45).

All Sallie Mae employees receive a performance evaluation after ninety days of employment, and Plaintiff received her first evaluation on February 5, 2002 (*id.*, DOAH Tr., Ex. P7).  The evaluation rated her as "needs improvement" in two areas, and she was given thirty days to improve (*id.*, DOAH Tr., Ex. P7).  Thereafter, Plaintiff received no performance counseling until September 30, 2002, when she received a verbal warning (*id.*, DOAH Tr., Ex. P12).  According to Sallie Mae policy, neither the verbal warning nor the February evaluation would have precluded Plaintiff from promotion (*id.*, Ex. A, Policies II-6, II-13), but she never applied for promotion (*id.*, Carlisle Dep. at 120).

In July 2002, Sallie Mae received a report that a supervisor at the Florida Center had made a racially discriminatory remark (*id.*, Carlisle Dep. at 96–97, Exs. 27, 29; *id.*, Wiley Aff. ¶5; *id.*,

DOAH Tr. at 205–06).  In the course of investigating the allegation, Director of Human Resources Bobby Wiley interviewed Plaintiff on July 19, 2002 (*id.*, Carlisle Dep. at 94–96, 98, Ex. 29; *id.*, Wiley Aff. ¶5; *id.*, DOAH Tr. at 31–34, 106, 205–06).  Neither Plaintiff nor Wiley told anyone else about their meeting, and Plaintiff's supervisor was unaware that Plaintiff met with Wiley (*id.*, Carlisle Dep. at 95, 125; *id.*, Wiley Aff. ¶6; *id.*, DOAH Tr. at 106–07, 210, 244–45).  At the meeting, Wiley explained that he was investigating a race discrimination allegation at the Florida Center, and he told Plaintiff that anything they discussed would remain confidential (*id.*, Carlisle Dep. at 94, 96–98, 100–01, 189, Ex. 14; *id.*, DOAH Tr. at 107–08, 206–07).  Although Plaintiff later stated that she thought she had witnessed racial discrimination at the Florida Center, she did not discuss her perception with Wiley because he ate ice cream while talking with her, she did not feel comfortable discussing the issue, she was afraid to lose her job, and she assumed Wiley would not properly handle the matter (*id.*, Carlisle Dep. at 77–78, 99–105, Exs. 14, 29; *id.*, DOAH Tr. at 34, 37, 108–15, 207).

On July 23, 2002, Plaintiff sent a letter to Senior Vice President of Human Resources Reich to complain about her meeting with Wiley and to ask how to submit a written statement of discrimination (*id.*, Carlisle Dep. at 94, 103–06, 189, Exs. 14, 27; *id.*, DOAH Tr. at 47–48, 116, Ex. P8).  Plaintiff did not inform anyone at Sallie Mae that she had contacted Reich (*id.*, Carlisle Dep. at 124; *id.*, DOAH Tr. at 52–53, 127–28, 231–32, 240–41).  On July 29, 2002, Plaintiff fainted at work, was taken by ambulance to the hospital, was absent from work in violation of the job abandonment policy, and was not fired (*id.*, Carlisle Dep. at 71, 166; *id.*, DOAH Tr. at 18–19).

On August 2, 2002, Reich responded to Plaintiff's letter, enclosing a copy of Sallie Mae's anti-harassment policy and explaining how Plaintiff could file a discrimination complaint (*id.*, Carlisle Dep. at 106, Exs. 15, 29; *id.*, DOAH Tr. at 49, 116–17, Ex. P9).  Additionally, on August 19, 2002, Reich met with Plaintiff and Senior Director of Human Resources Joyce Shaw to discuss Plaintiff's concerns (*id.*, Carlisle Dep. at 106–07, 116, Exs. 15, 16; *id.*, DOAH Tr. at 13, 118).  Plaintiff complained to Reich and Shaw about the way Wiley handled the July meeting and stated that she had been experiencing stress (*id.*, Carlisle Dep. at 108, 111; *id.*, DOAH Tr. at 53, 77, 124–25).  Additionally, Plaintiff stated that she felt that she was unfairly placed on a "probationary period," stated that supervisors were unpleasant and showed negative body language toward black

employees' questions, and expressed concerns about Sallie Mae's hiring process[3] (*id.*, Carlisle Dep. at 108–09, 111–14, 116–17, 120; *id.*, DOAH Tr. at 62–68).

Finally, Plaintiff told Shaw and Reich her perception that certain workplace comments were racially motivated (*id.*, DOAH Tr. at 53–58).[4]  In particular, Plaintiff described four comments: (1) Plaintiff's supervisor, Melanie Childres, referred to the Martin Luther King, Jr. holiday as "spook day"; (2) three employees told a black manager not to go to the "master cube" (the area in Sallie Mae's call center where employees' telephone conversations with customers were monitored); (3) during a phone conversation, a student's mother told Plaintiff that another Sallie Mae employee had called her daughter "stupid nigger"; and (4) where a black supervisor was married to a white woman, an employee stated that he was "going to string [the black supervisor] up for messing with our women" (*id.*, DOAH Tr. at 53–62, 122–23).  While Plaintiff claimed that she had experienced this behavior since November 2001, this meeting was the first time she brought her concerns to Sallie Mae's attention, because she was afraid of retaliation[5] (*id.*, Carlisle Dep. at 109–10; *id.*, DOAH Tr. at 59–60).

Shaw and Reich apologized for the way Plaintiff perceived the meeting with Wiley and suggested that Plaintiff seek counseling through the employee assistance program (*id.*, Carlisle Dep. at 108; *id.*, DOAH Tr. at 77, 124–25).  Additionally, Shaw and Reich took notes regarding Plaintiff's concerns and promised to investigate her allegations (*id.*, Carlisle Dep. at 110–11, 121).  Reich gave Plaintiff her business card, in case Plaintiff wished to report additional problems, but Plaintiff did not contact Reich or Shaw after the meeting (*id.*, Carlisle Dep. at 122–23; *id.*, DOAH Tr. at 126). After investigating Plaintiff's allegations, Sallie Mae did not find any evidence substantiating her complaints (*id.*, Carlisle Dep. at 123–24, 169; *id.*, DOAH Tr. at 128, 177–78; *id.*, Shaw Aff. ¶6).

---

[3]The hiring/conversion process affected all employees, and some white employees were also denied a Sallie Mae job application (Doc. 24, Carlisle Dep. at 120).

[4]In her deposition, Plaintiff did not mention that she told Shaw and Reich about any workplace comments (Doc. 24, Carlisle Dep. at 108–23).  The DOAH hearing was the first time she claimed that she told Shaw and Reich about these comments (*id.*, DOAH Tr. at 53–62, 122–23).

[5]Plaintiff admits that nobody at Sallie Mae ever suggested that she would lose her job if she reported discrimination (Doc. 24, Carlisle Dep. at 110).

Plaintiff's supervisor, Paul Wunstell, never knew that she met with Reich and Shaw (*id.*, Carlisle Dep. at 124–25; *id.*, Wunstell Aff. ¶5; *id.*, DOAH Tr. at 128, 176–79, 231).

On October 8, 2002, Plaintiff applied for employment with the Bay District School System and other entities, because she was considering leaving Sallie Mae (*id.*, Carlisle Dep. at 54–56, 62, Ex. 7; *id.*, DOAH Tr. at 129–30, Ex. 7).

On October 29, 2002, Plaintiff was injured at work when her telephone headset flipped across her face, hit her mouth, and chipped her tooth (*id.*, Carlisle Dep. at 129–31; *id.*, DOAH Tr. at 130–31). Although Plaintiff was not in pain and was able to talk and eat without problems, her gums felt uncomfortable, so on October 30, 2002, she reported the injury to Kristie Scott, Sallie Mae's Human Resources and Safety Representative (*id.*, Carlisle Dep. at 131–33, 135, Ex. 18). Within twenty-four hours of Plaintiff's report, Scott contacted Sallie Mae's workers' compensation carrier to obtain treatment for Plaintiff (*id.*, Carlisle Dep. at 133–34, 139–41, Exs. 18, 19, 20; *id.*, DOAH Tr. at 130–32). On October 31, 2002, after Scott was unable to locate a dentist who would accept the case as a workers' compensation claim, she told Plaintiff to see a dentist of her choice and she would be reimbursed (*id.*, Carlisle Dep. at 142, Ex. 20).

Despite her injury, Plaintiff worked full shifts on Wednesday, October 30; Thursday, October 31; and Friday, November 1 (*id.*, Carlisle Dep. at 134, Exs. 27, 29; *id.*, DOAH Tr. at 133, 185). When Plaintiff left work on Friday, November 1, her supervisor believed that she had removed all personal belongings from her workstation (*id.*, Wunstell Aff. ¶8). Plaintiff admits that she threw away the only personal belonging at her workstation, a picture frame, because it was damaged when her headset flipped (*id.*, Carlisle Dep. at 150–51).

Plaintiff claims that her neck stiffened after November 1, and on Monday, November 4, Plaintiff did not go to work (*id.*, Carlisle Dep. at 141–42, 222, Ex. 29; *id.*, DOAH Tr. at 135).[6] Instead, she called her supervisor, Wunstell, and told him that she was in pain from the tooth injury and was trying to find a dentist to see her (*id.*, Carlisle Dep. at 141–42, 151, 222). None of the dentists whom Plaintiff contacted considered her injury one that required emergency treatment, and

---

[6]Although Plaintiff claimed that she was in too much pain to work on Monday, November 4, she did drive herself to and participate in a mental health counseling session that day (Doc. 24, Carlisle Dep. at 152–53; *id.*, DOAH Tr. at 135).

Plaintiff told Wunstell that November 12 was the earliest appointment she had been able to obtain (*id.*, Carlisle Dep., Ex. 24; *id.*, DOAH Tr. at 135). Plaintiff did not tell Wunstell when she would return to work (*id.*, Carlisle Dep. at 151–52, 158, Ex. 29; *id.*, DOAH Tr. at 137). Plaintiff told Wunstell that she would like to see a regular doctor for her neck, and she asked Wunstell to have Scott call her at home to make arrangements to see a regular doctor (*id.*, Carlisle Dep. at 141, 143, 151, Exs. 24, 27). Plaintiff did not ask Wunstell for Scott's telephone number and did not feel that having a doctor examine her neck was an emergency (*id.*, Carlisle Dep. at 143–45, 148; *id.*, DOAH Tr. at 136, 138–39). Plaintiff states that she did not hear from Wunstell again, but she made no effort to contact him after November 4 and made no effort to contact Scott directly, even though she had been dealing with Scott regarding her tooth injury and Scott had always returned her calls promptly (*id.*, Carlisle Dep. at 145, 147–48; *id.*, DOAH Tr. at 138–39).

Plaintiff failed to call or appear for work on November 5, 6, and 7 (*id.*, Carlisle Dep. at 158, Ex. 29; *id.*, DOAH Tr. at 138). Instead, she remained at home, waiting to hear from Wunstell or Scott (*id.*, Carlisle Dep. at 145–46). She did not contact her regular dentist again to insist on medical treatment, and she did not go to the emergency room for her neck discomfort (*id.*, Carlisle Dep. at 137, 141). In fact, Plaintiff admits that her neck pain was not unbearable, and she never saw a doctor to treat her neck (*id.*, Carlisle Dep. at 144–45; *id.*, DOAH Tr. at 135). Plaintiff decided that she would return to work "as soon as she could" and that she would call Wunstell or Scott on Monday, November 11 if she had not heard from them (*id.*, Carlisle Dep. at 155–56).

When Plaintiff visited a dentist two weeks after her injury, he simply performed a regular exam and cleaning (*id.*, Carlisle Dep. at 131, 134–35, 138, 184, Ex. 26; *id.*, DOAH Tr. at 133–34). Plaintiff failed to attend a follow-up dental appointment on November 19, and since then, she has not visited a dentist for further treatment of her tooth (*id.*, Carlisle Dep. at 41, 138, 184, Ex. 25).

Because Plaintiff had not reported to work since November 1, had not contacted Wunstell since November 4 to tell him when she would return to work, and had appeared to remove her personal belongings from her work station, Wunstell believed that Plaintiff had voluntarily resigned (*id.*, Carlisle Dep. Ex. 21, 31; *id.*, Wunstell Aff. ¶8). Wunstell requested that Human Resources send Plaintiff a letter confirming the termination for job abandonment (*id.*, Wunstell Aff. ¶¶8–9; *id.*, DOAH Tr. at 230). Wiley, Shaw, and Reich were not involved in terminating Plaintiff (*id.*, DOAH

Tr. at 141–42, 179, 213, 231–32; *id.*, Wunstell Aff. ¶ 9; *id.*, Wiley Aff. ¶ 11; *id.*, Shaw Aff. ¶ 7).

On Friday, November 8, Sallie Mae sent Plaintiff a letter stating that she was considered to have resigned her position by failing to appear for work for three consecutive days and failing to keep her supervisor informed of her whereabouts after November 4 (*id.*, Carlisle Dep. at 158–59, 180, Exs. 21, 29).  The letter invited Plaintiff to contact Human Resources representative Teresa Jones if she had any questions regarding the letter (*id.*, Carlisle Dep. 160, Ex. 21; *id.*, DOAH Tr. at 140, Ex. 21).  Although Plaintiff personally knew Jones, she did not contact Jones or any other Sallie Mae employee to clarify that she had not intended to abandon her employment at Sallie Mae (*id.*, Carlisle Dep. at 81–82, 160–63, Ex. 9).  In addition, although the termination letter asked Plaintiff to complete a form explaining why she resigned, she did not complete the form to clarify that her termination was a misunderstanding (*id.*, Carlisle Dep. at 163, Ex. 21).  Plaintiff did not file for unemployment compensation benefits when her employment with Sallie Mae ended, and on November 17, plaintiff began working for the Bay District School System (*id.*, Carlisle Dep. at 14, 45–46, Ex. 6; *id.*, DOAH Tr. at 141).

In January 2003, two months after her last day at Sallie Mae, Plaintiff sent a letter to Sallie Mae's Vice-Chairman and CEO, Al Lord (*id.*, Carlisle Dep. at 174, Ex. 23; *id.*, DOAH Tr. at 147).  The letter was the first time Sallie Mae learned that Plaintiff did not intend to resign, but Plaintiff has no explanation for why she waited two months before contacting Sallie Mae (*id.*, Carlisle Dep. at 174–75, Ex. 31).  Additionally, the letter to Lord contains statements that Plaintiff now admits were untrue: it incorrectly alleged that Sallie Mae did not help her obtain dental treatment for her tooth injury and makes no reference to her request to Wunstell to see both a dentist and a doctor for her dental injury (*id.*, Carlisle Dep. at 175–79, Ex. 23; *id.*, DOAH Tr. at 148–50).  Sallie Mae investigated the allegations in Plaintiff's letter, found no evidence corroborating her retaliation claim, and informed Plaintiff of its findings (*id.*, Carlisle Dep. Ex. 31; *id.*, DOAH Tr. at 150–52, 180–83).

On June 3, 2003, Plaintiff filed a charge of discrimination with the Florida Commission on Human Relations ("Florida Commission") and the Equal Employment Opportunity Commission EEOC") alleging harassment, disparate treatment, and that she was terminated in retaliation for participating in the July 2002 investigation of another employee's complaint and for filing her own

complaint in July 2002 (*id.*, Carlisle Dep. Ex. 27).  The Florida Commission investigated the charge, and during the investigation, Plaintiff alleged that Sallie Mae owed her $409.00 in accrued and unused vacation time (*id.*, Carlisle Dep. Ex. 24; *id.*, DOAH Tr. at 27).  Sallie Mae investigated this allegation, found a payroll error, and sent Plaintiff a check for accrued vacation pay (*id.*, DOAH Tr. at 27–29, 31, 213, Ex. P5).

On January 14, 2004, the Florida Commission concluded that Plaintiff was terminated for legitimate, non-discriminatory and non-retaliatory reasons: her admitted violation of Sallie Mae's "no call-no show" policy by not notifying the company for three consecutive days about the progress of her medical condition or the date she would return to work (*id.*, Carlisle Dep. Ex. 29).  Plaintiff admits that the report's factual summary accurately reflects the information that she provided to the investigator (*id.*, Carlisle Dep. at 194).  On April 12, 2004, the Florida Commission issued a "no cause" determination (*id.*, Carlisle Dep. at 191–92, 214–15, Exs. 29, 30).

On May 19, 2004, Plaintiff filed a Petition for Relief with the Florida Commission, alleging that she was terminated in retaliation for her participation in Wiley's July 2002 investigation and for filing an internal discrimination complaint with Reich in July 2002 (*id.*, Carlisle Dep. at 165, 189, Ex. 24).  Plaintiff does not know who at Sallie Mae made the decision to terminate her employment for job abandonment, but she believes Wunstell was the retaliatory official (*id.*, Carlisle Dep. at 167–69, 173–74; *id.*, DOAH Tr. at 140).  Plaintiff cannot identify any other individual within Sallie Mae who retaliated against her, but as evidence of retaliatory motive, she alleges that there was no reason to terminate her for job abandonment (*id.*, Carlisle Dep. at 167, 169).

On December 4, 2004, an evidentiary hearing was held before a DOAH Administrative Law Judge ("ALJ") (*id.*, DOAH Tr.).  Plaintiff and representatives from Sallie Mae presented testimony and evidence, and cross-examined the other side (*id.*, DOAH Tr.).  On January 28, 2005, the ALJ issued a Recommended Order finding no race discrimination or retaliation and recommending that Plaintiff's allegations be dismissed (*id.*, Ex. B).  The Florida Commission agreed and dismissed Plaintiff's charge (*id.*, Ex. C).  Plaintiff did not appeal the Florida Commission's final order, and the EEOC issued a dismissal and notice of rights (Doc. 11, Ex. A).

Plaintiff initiated the instant action on September 12, 2005 (Doc. 1) and filed an amended complaint on February 3, 2006 (Doc. 11 at 7).  In her complaint,  Plaintiff raises claims of hostile

work environment, employer discrimination based on race, and retaliation (*see id.*).  First, Plaintiff alleges that Sallie Mae created a hostile work environment: on the Friday before the Martin Luther King holiday, Plaintiff and another black associate approached two white supervisors to inquire about Tuesday's schedule; one of the supervisors referred to Martin Luther King day as "spook Day" and both supervisors laughed (*id.*, ¶6).  Next, Plaintiff alleges that Sallie Mae discriminated against her on the basis of race by wrongfully terminating her while she was seeking medical treatment, failing to provide appropriate workers' compensation leave, refusing to pay Plaintiff $409.00 of accrued vacation, failing to properly investigate Plaintiff's complaints, giving Plaintiff unfair evaluations, denying Plaintiff an opportunity for promotion, setting unfair schedules, and refusing Plaintiff an application for employment in July 2001 (*see id.* ¶¶1, 2, 3, 5, 7, 8, 9, 10).  Finally, Plaintiff alleges that she was wrongfully terminated in retaliation for her participation in Wiley's July 2002 investigation and in retaliation for her July and August 2002 complaints to Shaw and Reich about discrimination (*id.* ¶4).

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  After a motion for summary judgment is made and supported as provided in Rule 56(c), "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id.*; *accord* Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).

Evidence presented by Plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to Plaintiff. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  However, Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations are insufficient.  Celotex, 477 U.S. at 324.  Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  Id.; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting Celotex, 477 U.S. at 324); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

B.    Hostile Work Environment

Plaintiff alleges that Sallie Mae created a hostile work environment (Doc. 11 ¶6).  At the DOAH hearing, she described four racially motivated comments: (1) a white supervisor referred to the Martin Luther King, Jr. holiday as "spook day"; (2) three employees told a black manager not to go to the "master cube"; (3) a student's mother told Plaintiff that another Sallie Mae employee had called the student a "stupid nigger"; and (4) an employee said that he "was going to string [the black supervisor] up for messing with our women," and the supervisor was married to a white woman (Doc. 24, DOAH Tr. at 53–62, 122–23).[7]

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff wishing to establish a hostile work environment claim must show that (1) she belongs to a protected group; (2) she has

---

[7]The only racially motivated comment Plaintiff cites in her sworn amended complaint is the first ("spook day") (see Doc. 11 at 6).  Although Plaintiff lists additional incidents in her amended response to Defendant's motion to dismiss (see Doc. 30 at 6–7), these allegations are unsworn, so they do not comply with the requirements of Rule 56. As discussed, supra note 1, these allegations will not be considered as facts for purposes of this report and recommendation.  See Fed. R. Civ. P. 56(c), -(e).

been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  Under the fifth prong, in order to establish a basis for holding Sallie Mae liable for a hostile work environment, Plaintiff must show that Sallie Mae had notice of the alleged harassment and failed to take immediate and appropriate corrective action.  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1257 (11th Cir. 2003) (citations omitted).

In the instant case, Plaintiff has failed to show that any harassment to which she was subjected[8] was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  The issue of whether harassing conduct was "sufficiently severe or pervasive to alter the terms of conditions of employment" involves both an objective and a subjective component.  Miller, 277 F.3d at 1276.  The objective severity of harassment should be judged from the perspective of a reasonable person in Plaintiff's position, considering all of the circumstances.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993); Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). In determining "objective severity," the court must consider, among other factors, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Harris, 510 U.S. at 23; Mendoza, 195 F.3d at 126.  "[C]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  Harris, 510 U.S. at 23.

---

[8]It is far from clear that Plaintiff has established that she was "subject to" unwelcome harassment or that the harassment was based on a protected characteristic.  Only one of the comments ("spook day") was made directly to Plaintiff, and only one ("stupid nigger") is racial on its face, but Plaintiff did not hear the latter comment.  However, for purposes of this report and recommendation, this court will assume that Plaintiff can meet the second and third prongs of the hostile work environment test.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to show a genuine issue of material fact as to whether a reasonable person would find her work environment hostile or abusive, within the meaning of Title VII.  First, the incidents were not frequent: Plaintiff cites only four incidents that occurred during the *year* that she was employed by Sallie Mae.  Second, the conduct was not severe: only one of the comments was made directly to Plaintiff and only one was facially racial.  None of the comments were made about Plaintiff.  Next, none of the comments were physically threatening.  Finally, Plaintiff has presented no evidence demonstrating that the conduct interfered in any way with her job performance.  Thus, Plaintiff has failed to show that a genuine issue of material facts exists as to whether the alleged conduct was sufficiently severe or pervasive to amount to a "discriminatory change in the 'terms and conditions of employment.'" Harris, 510 U.S. at 21; *see* Miller, 277 F.3d at 1277 (suggesting that "overhearing occasional off-color comments" is insufficient to satisfy the "sufficiently severe and pervasive test").

Accordingly, Sallie Mae is entitled to summary judgment on the hostile environment claim.

C.     Disparate Treatment

Several allegations in Plaintiff's complaint can be construed as alleging disparate treatment (*see* Doc. 11 ¶¶1, 2, 3, 5, 7, 8, 9, 10).  Plaintiff suggests that Sallie Mae discriminated against her by wrongfully terminating her while she was seeking medical treatment, failing to provide appropriate workers' compensation leave for Plaintiff, refusing to pay Plaintiff $409.00 of accrued vacation, failing to properly investigate Plaintiff's complaints, giving Plaintiff unfair evaluations, denying Plaintiff an opportunity for promotion, setting unfair schedules, and refusing Plaintiff an application for employment in July 2001 (*see id.* ¶¶1, 2, 3, 5, 7, 8, 9, 10).

Under the well-established three pronged standard of proof, an employee has the initial burden of establishing a prima facie case of disparate treatment in the workplace.  Plaintiff must show that "(1) she belongs to a protected class, (2) she was subjected to adverse job action, (3) her employer treated similarly situated employees outside her classification more favorably, and (4) she was qualified to do the job."  Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  If Plaintiff establishes a prima facie case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the adverse action.  *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).  If the employer does so,

the burden shifts back to the employee to show that the reason offered by the employer was not the real reason for the adverse employment action but merely pretext. *See* Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). The employee largely accomplishes this by demonstrating either that the discriminatory motive more likely caused the adverse action or that the employer's explanation for the adverse action is "unworthy of credence." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981).

Regarding the second prong, the relevant provision of Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a).  Courts have uniformly read this language to require a plaintiff suing under § 2000e-2(a) to establish, as part of her prima facie case, that she suffered so-called "adverse employment action."  *See* Davis v. Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001) (citing Merriweather v. Alabama Dept. Pub. Safety, 17 F.Supp.2d 1260, 1274 (M.D. Ala. 1998) ("[A] term or condition of employment may be said to have been affected if there is a 'demonstrable adverse impact' . . . .")), *aff'd*, 199 F.3d 443 (11th Cir. 1999); Allen v. Michigan Dep't Corr., 165 F.3d 405, 410 (6th Cir. 1999) ("In order to set forth a claim of racial discrimination, a plaintiff must show that he has suffered an adverse employment action . . . ."); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (finding that plaintiff failed to prove "the adverse conduct required to make a prima facie case").  Although the Eleventh Circuit has not adopted a bright-line test for what kind of effect the alleged discrimination must have on the plaintiff's "terms, conditions, or privileges" of employment for it to be actionable, the court has held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show "a serious and material change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1238–39 (citations omitted).  Furthermore, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* at 1239.

Plaintiff has not established a prima facie case of discrimination, because none of her claims meet all four prongs of the standard.  Each of her claims will be discussed in turn.

First, Plaintiff alleges that Sallie Mae wrongfully terminated her while she was seeking medical treatment for a work-related injury (Doc. 11 ¶1).  Plaintiff contends that Sallie Mae did not carry out its "no call-no show" policy consistently and attaches a letter dated December 17, 2002 from Doris A. Hast, a Senior Human Resource Generalist at Sallie Mae, to Patricia Donahue (Doc. 30, Ex. 2).  The letter states that Hast spoke with Donahue on November 25, 2002 about Donahue's inability to complete the Private Credit Originations training class into which she was hired on November 11, 2002, because of her mother's serious health condition (*id.*, Ex. 2).  The letter indicates that Hast offered to move Donahue to another class beginning the week of December 9, and Donahue said she would be interested in that (*id.*, Ex. 2).  However, after Hast telephoned Donahue several times and was unable to reach her, Sallie Mae terminated Donahue's employment as of November 21, 2002 (*id.*, Ex. 2).  Neither the letter nor the allegations in Plaintiff's amended response indicate whether Donahue worked for Sallie Mae prior to beginning the training class, or whether Donahue is white or a member of a protected class (*see id.*, Ex. 2).

Viewing the evidence in the light most favorable to Plaintiff, she has not demonstrated that she was subjected to an adverse employment action or that Sallie Mae treated similarly situated employees outside her classification more favorably.  Plaintiff was not subjected to adverse employment action because <u>she</u> voluntarily abandoned her job under Sallie Mae's "no call-no show" policy.  Although Plaintiff was aware of Sallie Mae's policy, she did not tell any Sallie Mae employee that she would not be at work on the days following November 4 or when she would return to work.  She also did not respond to the termination letter to alert Sallie Mae that she had not voluntarily resigned.  Additionally, Plaintiff has not demonstrated that Sallie Mae treated similarly situated employees outside her classification more favorably.  Plaintiff has produced evidence of one instance in which Sallie Mae called an employee before terminating her (*id.*, Ex. 2), but it is clear from the attached letter that Plaintiff and Donahue were not similarly situated, because Donahue had been hired into a training class while Plaintiff was already a full-time employee.  Further, nothing filed by Plaintiff indicates Donahue's race.  On the other hand, Sallie Mae has produced evidence that, of the twenty-eight Florida Center employees terminated pursuant to the job abandonment policy in 2002, twenty-five were white and none (besides Plaintiff) had participated in an investigation of or had filed a discrimination complaint.

Second, Plaintiff argues that Sallie Mae failed to provide appropriate workers' compensation leave for her and refused to pay her $409.00 of accrued vacation (Doc. 11 ¶¶2, 3). Construing the evidence in the light most favorable to Plaintiff, the evidence contradicts her claims. Sallie Mae told Plaintiff that it would reimburse her for her dentist visit, and it did in fact pay her the $409.00 of accrued vacation, albeit late. Even if Plaintiff were subjected to an adverse employment action, she has not produced any evidence demonstrating that Sallie Mae treated similarly situated employees outside her classification more favorably.

Third, Plaintiff alleges that Sallie Mae failed to properly investigate Plaintiff's complaints, because she never received a response after her meeting with Reich and Shaw (*id.* ¶5). Construing the evidence in the light most favorable to Plaintiff, the evidence belies Plaintiff's claim; indeed, the evidence shows that Sallie Mae provided Plaintiff with both a written and online copy of Sallie Mae's anti-harassment policy and responded to and investigated Plaintiff's grievances in a timely and appropriate manner. Furthermore, even if Sallie Mae did not respond in a timely and appropriate manner, Plaintiff has not established that she was subjected to adverse employment action: she does not allege she suffered any tangible harm as a result of Sallie Mae's allegedly insufficient response following her meeting with Reich and Shaw. Plaintiff does not allege that Sallie Mae's actions altered her compensation, terms, conditions, or privileges of employment, deprived her of employment opportunities, subjected her to formal discipline, or adversely affected her status as an employee. *See* Davis, 245 F.3d at 1240–43.

Fourth, in her amended complaint, Plaintiff contends that Sallie Mae gave her unfair evaluations and denied her an opportunity for promotion (*id.* ¶¶7, 8). She alleges that Sallie Mae placed her on a ninety-day probationary period when she was first hired, and sixty days into the period reprimanded her for not meeting standards (*id.* ¶7). When the ninety-day evaluation ended, Plaintiff was placed on an additional ninety-day probationary period, but within three weeks, Sallie Mae assigned her more difficult tasks (*id.*). Plaintiff states that because Sallie Mae kept her on probationary periods, she was ineligible to post out of her current position (*id.* ¶8). In its motion for summary judgment, Sallie Mae produced the following evidence: all Sallie Mae employees receive a performance evaluation after ninety days of employment; Plaintiff's first evaluation in February 2002 rated her as "needs improvement" in two areas, and she was given thirty days to improve;

thereafter, Plaintiff received no performance counseling until September 30, 2002, when she received a verbal warning; neither the verbal warning nor the February evaluation would have precluded Plaintiff from promotion; and Plaintiff never applied for promotion.

Although Plaintiff's version of the facts differs from Sallie Mae's, Plaintiff did not produce evidence regarding this claim in her amended response to Sallie Mae's motion for summary judgment (*see* Doc. 30), so she had not demonstrated that there is a genuine issue for trial, *see* Fed. R. Civ. P. 56(e).  Viewing the evidence in the light most favorable to Plaintiff, she has not demonstrated either adverse employment action or that Sallie Mae treated her differently from other employees.  Plaintiff admits that she did not apply for a promotion, so it cannot be said that Sallie Mae denied her a promotion.  Furthermore, Plaintiff has produced no evidence demonstrating that similarly situated employees outside her protected classification were evaluated or considered for promotions differently.

Fifth, Plaintiff argues that Sallie Mae was unfair in scheduling (Doc. 11 ¶9).  Initially Plaintiff was refused time off for an Employment Assistance counseling session, because telephone representatives were supposed to spend 96% of their scheduled time on phones (*id.*).  Despite this, Holly Grossman, a white associate, was given a special schedule, including thirty minutes off the telephones at the end of the day, to accommodate her husband's schedule (*id.*).  Viewing the evidence in the light most favorable to Plaintiff, she has not established that she was subjected to an adverse employment action.  Plaintiff admits that, although her request for Monday mornings off was initially denied, it was approved as soon as she met with Doris Hast in the Human Relations Department (Doc. 24, DOAH Tr. at 78–79).  The initial denial was not "a serious and material change in the terms, conditions, or privileges of employment."  Additionally, Plaintiff has not demonstrated that Sallie Mae treated similarly situated employees outside her classification different than Plaintiff.  Although Plaintiff identifies that Grossman was also given a special schedule, Plaintiff has not established that Sallie Mae handled Grossman's initial request for a special schedule differently than it handled Plaintiff's request.

Finally, Plaintiff states that Sallie Mae refused her an application for employment in July 2001, when she initially sought employment (*id.* ¶10).  Viewing the evidence in the light most favorable to Plaintiff, she has not demonstrated adverse employment action or that Sallie Mae

treated her differently than other employees outside her protected class. Plaintiff admits that in July 2001, when she requested an employment application, she was told that all new Sallie Mae employees had to first pass a skills test, complete a training class, and then work for Kelly Services for ninety days. She was immediately given a skills test, placed in a training class, and hired by Kelly Services. After ninety days, she was hired by Sallie Mae. The fact that Sallie Mae did not give Plaintiff an application in July 2001 is not an adverse employment action, because it had no effect on the speed at which Plaintiff was ultimately hired by Sallie Mae. Plaintiff also admits that this hiring process affected both black and white employees.

In sum, whether considered individually or collectively, the employment actions of which Plaintiff complains cannot be considered "adverse" because they did not harm Plaintiff. Additionally, Plaintiff has not demonstrated that Sallie Mae treated other similarly situated employees better than it treated her. Construing the facts in the light most favorable to Plaintiff, she has failed to produce evidence of a prima facie case of disparate treatment; therefore, Sallie Mae is entitled to judgment as a matter of law on Plaintiff's race discrimination claims.

> D.    Retaliation

Plaintiff claims that Sallie Mae retaliated against her by terminating her employment because she participated in Wiley's July 2002 investigation and because she complained to Shaw and Reich about discrimination in July and August 2002 (Doc. 11 ¶4).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was some causal relation between the two events. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. Id. If that burden is met, the plaintiff then bears the ultimate burden of proving, by a preponderance of the evidence, that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. Id.

Plaintiff has not shown any of the three prongs necessary to establish a prima facie case. Initially, Plaintiff did not engage in protected activity. The Participation Clause of Title VII's

anti-retaliation provision protects an employee from discrimination if she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See* 42 U.S.C. § 2000e-3(a).  The Participation Clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." E.E.O.C. v. Total Sys. Serv., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).  "[A]t a minimum, some employee must file a charge with the EEOC (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the [P]articipation [C]lause." *Id.* at 1174 n.2.  Activities invoking the jurisdiction of the federal government through the EEOC are entitled to expansive protection. *See id.* at 1175–76.

In the instant case, Plaintiff's meeting with Wiley was part of an internal investigation, not an investigation conducted in relation to a formal charge filed with the EEOC.  Therefore, her statements to Wiley were not protected expression under the Participation Clause.  Moreover, Plaintiff's EEOC charge was filed in June 2003, but Sallie Mae terminated Plaintiff in November 2002.  Thus, Plaintiff could not, as a matter of law, have engaged in protected activity under the Participation Clause at the time of the alleged retaliatory incident, because she had not yet filed a charge with the EEOC.  *See* Total Sys. Serv., 221 F.3d at 1174.

Furthermore, to the extent Plaintiff relies upon the Opposition Clause of Title VII's anti-retaliation provision, she has also failed to establish a prima facie case.  Under the Opposition Clause, an employee is protected from discrimination if she "has opposed any practice made an unlawful employment practice by this subchapter." *See* 42 U.S.C. § 2000e-3(a).  A plaintiff can establish a prima facie case of retaliation under the Opposition Clause if she shows that she had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Tech., 103 F.3d 956, 960 (11th Cir. 1997).  In order to satisfy this standard,

> A plaintiff must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*  "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law."  Clover v. Total Sys. Serv., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  Opposition Clause acts are viewed in the context of the ordinary business environment and thus are given less protection than Participation Clause acts.  Total Sys. Serv., 221 F.3d at 1176.

Plaintiff did not complain about race discrimination at her meeting with Wiley, so that meeting is not covered by the Opposition Clause.  In her meeting with Shaw and Reich, Plaintiff complained that she did not like the way Wiley handled the July meeting, that she felt her probationary period was unfair, that she felt supervisors were unpleasant and showed negative body language toward black employees' questions, and that she perceived certain workplace comments to be racially motivated.  When measuring Plaintiff's complaints, including her belief that she was harassed based on her race, against existing substantial law, and viewing the same in the context of the ordinary business environment, *see* Little, 103 F.3d at 960, Plaintiff's belief that Sallie Mae was engaged in unlawful employment practices was objectively unreasonable.  Clover, 176 F.3d at 1351; *see supra* Section II.B.–II.C.  Therefore, Plaintiff cannot show that she was engaged in protected activity for purposes of establishing a prima facie claim of retaliation.

Next, Plaintiff did not suffer an adverse employment action when Sallie Mae terminated her after she voluntarily abandoned her job (*see supra* Section II.C.).  Finally, even assuming that Plaintiff could satisfy the first two prongs, she cannot show a casual connection between her complaint and her termination.  To establish a casual connection, Plaintiff must present concrete evidence that the individual who made the decision to terminate her employment was aware of her protected expression when he decided to take adverse action.  *See* Clover, 176 F.3d at 1354–55; Sullivan v. AMTRAK, 170 F.3d 1056, 1060 (11th Cir. 1999); Raney v. Vinson Guard Serv., 120 F.3d 1192, 1197–98 (11th Cir. 1997).  In the instant case, Plaintiff's supervisor, Wunstell, is the person who concluded that Plaintiff had abandoned her job and who requested her termination.  However, Plaintiff admits that at the time of her abandonment, Wunstell had no knowledge of Plaintiff's participation in Wiley's investigation or her complaint to and meeting with Shaw and Reich.  Plaintiff did not tell anyone at Sallie Mae about her meetings with Wiley, Reich, or Shaw, and she has no personal knowledge that anyone else knew of these meetings.  Since Wunstell did

not know of Plaintiff's complaints when he requested her termination, Plaintiff cannot show a casual link between protected activity and adverse employment action.

Accordingly, Sallie Mae is entitled to summary judgment on the retaliation claim.

III.    CONCLUSION

Upon consideration of Plaintiff's claims and the evidence submitted, the court concludes that there exists no genuine issue of material fact, and that Plaintiff has failed to establish her claims under Title VII.  Thus, as a matter of law, Sallie Mae is entitled to judgment in its favor.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Defendant's Motion for Summary Judgment (Doc. 24) be **GRANTED**.

2.      That all pending motions be **DENIED as moot**.

3.      That judgment be entered by the clerk in favor of Defendant.

At Pensacola, Florida this 7<u>th</u> day of December 2006.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

**Any objections to these proposed findings and recommendations must be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**